UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GAIGE WHITE                                                    CIVIL ACTION

VERSUS                                                          NO. 18-12357

ROBERT TANNER ET AL.                            SECTION "A" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Gaige White, is a prisoner currently incarcerated in the Rayburn Correctional Center ("Rayburn") in Angie, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Rayburn Warden Robert Tanner, Michael Phillips and other parties that have since been voluntarily dismissed. Record Doc. Nos. 1; 22; 23. Only Robert Tanner and Michael Phillips remain named defendants in this case.

White asserts three claims: (1) While incarcerated in Rayburn on September 14, 2018, defendant Phillips exercised excessive force against him. (2) Two guards, Kevin White and an individual he identified only as (sp?) Wasburg (sp?), both of whom are allegedly family members of Michael Phillips, retaliated against him after Phillips was fired. (3) Defendant Robert Tanner improperly denied his administrative remedies procedure ("ARP") grievance.

On April 9, 2019, defendants Phillips and Tanner filed a motion to dismiss for failure to state a claim. Record Doc. No. 24. Plaintiff was ordered to file a response to that motion no later than May 21, 2019. Record Doc. No. 28. No response has been received.

On March 20, 2019, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Dennis O. Durocher, Jr., counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and its progeny. After the <u>Spears</u> hearing and pursuant to my order, defense counsel submitted to me reports and ARP grievance records concerning the incidents between plaintiff, Phillips, Wilson and (sp?) Wasberg (sp?) and the surveillance videotape of the subject incident, and I have reviewed them in connection with this report. Record Doc. Nos. 25, 26, 27, 34.

## **THE RECORD**

I.    <u>PLAINTIFF'S TESTIMONY</u>

Plaintiff testified that he is currently incarcerated in Rayburn based upon a conviction on April 17, 2017, for criminal trespassing, for which he is serving a six-year prison sentence. He stated that his estimated release date is in 2026. White testified that he was first incarcerated in Rayburn in May 2017. He confirmed that his claims in this case are based principally on an incident that occurred on September 14, 2018, while he was incarcerated in Rayburn.

White confirmed that he asserts three claims in the instant case. First, he testified that on September 14, 2018, at about 6:30 p.m., during the guards' shift change, there was loose trash, "torn-up newspaper," in his cell. He testified that he pushed the trash out of his cell, Phillips "swept it back into to his cell" and White pushed it back out again. He testified that this happened a few times, after which Phillips "grabbed [him] by the arm." White

testified that suffered a "scratch" on his "upper right arm" because of Phillips grabbing him. Plaintiff then stated that Phillips grabbed him by his neck "for about two seconds," and then "let [his] neck go" and "poked [him] with the broom . . . in [his] stomach." Plaintiff testified that he had "a red mark around [his] neck and it's been hurting." Plaintiff testified that he had "a scratch [on his stomach] and a little blood." Plaintiff testified, and his medical records confirm, that he received a topical antibiotic and treatment for these injuries, the scratches healed "after about a week," and the scar on his arm is "maybe an inch [long], like a fingernail mark." Plaintiff stated that Lieutenant Temple came down, said "oh, shit," removed Phillips and told plaintiff to file an ARP grievance. Plaintiff testified that the entire incident lasted "maybe five to ten minutes." Plaintiff stated that Phillips was fired because of this incident.

White stated that Phillips's family members work at the jail and have retaliated against him for "getting [Phillips] fired." Plaintiff testified that a week after the September 14, 2018 incident, a guard whom he identified as (sp?) Wasburg (sp?), but who appears from documentation in the record to be Corin Weisbrodt and who is allegedly Phillips' cousin, said that he was responding to a self-declared emergency and ordered plaintiff out of his cell, put him in handcuffs, slammed his head "into the key box" and jumped on him. Weisbrodt allegedly said that he did this because "[plaintiff] got his cousin fired." Plaintiff stated that he was found not guilty for these charges. Plaintiff also testified that Kevin Wilson, another guard who works the night shift and who allegedly is Phillips's uncle, retaliated against him by "writing [him] up for no reason . . . for aggravated disobedience

and defiance." Plaintiff stated that he was found guilty of defiance. Plaintiff stated that he intended to sue these two individuals for retaliating against him.

As to his claims against Warden Robert Tanner, plaintiff testified that he sued Tanner because the warden improperly "denied [plaintiff's] ARP [grievance]." Plaintiff testified that Tanner granted his ARP grievance at the "first step," but denied it "at the second step."

II.    <u>VIDEO AND INCIDENT REPORTS</u>

Upon plaintiff's request and in compliance with my order, defendants submitted incident reports and a video of the September 14, 2018 incident, together with reports of the incidents between plaintiff and Wilson and Weisbrodt for in camera review. Record Doc. Nos. 25, 26, 34.

Regarding the September 14, 2018 incident, the records include an email from Josh Miley to Keith Bickham, Billy Anderson, Jody Knight, and Kevin Luper. Record Doc. No. 25-2 at p. 2. That email indicates that Miley watched a video of the incident and summarized it. <u>Id.</u> His email notes that "Phillips was relieved of his duties and escorted to the interlock by Captain Wade Rigdon and myself." <u>Id.</u> Miley also notes in his email that plaintiff "was seen by Nurse Angela Myres . . . [who noted] a scratch on [plaintiff's] right upper arm." <u>Id.</u>

The record confirms that White submitted an ARP grievance after the subject incident, complaining that "Phillips grabbed his forearm causing him to have a scratch." Record Doc. No. 25-2 at p. 4. The record shows that, contrary to plaintiff's oral testimony,

his ARP grievance was denied both at Step 1 <u>and</u> Step 2. <u>Id.</u> During the second step, the record reflects that after the incident, Lieutenant Temple "asked if [plaintiff] needed to make an emergency sick call request and [plaintiff] responded 'no forget it, ya'all (sic) will read about it.' Nonetheless [plaintiff was] seen by medical staff on . . . [the] same day." <u>Id.</u> at p. 5. The report notes that plaintiff's "medical assessment indicated that [he was] in no apparent distress." <u>Id.</u> The Health Care Request Form included in the record confirms that the nurse noted a scratch on plaintiff's right upper arm and that a topical antibiotic was applied. Record Doc. No. 25-2 at p. 11. The record also reflects that White filed a second ARP grievance concerning this incident, alleging that Phillips struck him in the face. Record Doc. No. 25-2 at p. 15. However, this grievance was denied because when plaintiff first complained of the incident, he "made no claim of [Phillips] striking [him] in the face." <u>Id.</u>

The video of the September 14, 2018 incident, which has no sound, shows two angles: one which depicts the cells from down the hall, and the other which faces the cells directly. The first video begins at 18:50:00. The time stamp, which is somewhat difficult to read clearly, is at the bottom left-hand corner of the video. A wide-angle view of a row of cells shows two prisoners in their cells, including White. White is in the second cell from the camera. A trash bag and a broom are visible across from White's cell, with small pieces of trash scattered across the hallway between the cell and the wall. At about 18:50:12, White is observed throwing a bed sheet out of his cell.

Phillips enters the video at 18:51:05 with a broom, and can be seen sweeping trash directly into White's cell at 18:51:07. Phillips continues to sweep trash into plaintiff's cell until about 18:51:54, when he goes to the cell closest to the camera, handcuffs that prisoner (<u>not</u> White) and begins to escort him down the hall past White's cell. As he passes White's cell, at approximately 18:52:20, White throws an assortment of loose trash back through the cell bars. Phillips looks back at White and proceeds to escort the other prisoner down the hallway. At 18:53:47, Phillips and the other prisoner can be seen walking back down toward White's cell. At 18:53:58, Philips and the other prisoner walk by his cell and both glance into it. Phillips and White appear to be exchanging words. Phillips puts the other prisoner back in his cell at about 18:54:05, and at 18:54:32 Phillips begins to sweep trash back into White's cell.

As Phillips is sweeping, White reaches out and grabs the broom handle (18:54:42). White immediately releases the handle, and the two appear to exchange words for a few seconds (until 18:54:47). At 18:54:48, Phillips reaches through the bars and can be seen pulling White close to him, and White momentarily grabs the broom handle again. Plaintiff and Phillips continue to exchange words for a few seconds, and at 18:55:01, Phillips gets closer to the bars and extends the broom handle slightly through the bars as he is holding it. Phillips then continues to sweep the trash back into plaintiff's cell (18:55:10). As he is doing so, White reaches out and tries forcibly to grab the broom handle again (18:55:19). At 18:56:23, Phillips can be seen reaching into White's cell and places the broom handle into the bars. Five seconds later, at 18:56:28, he removes the handle from the bars and

begins sweeping trash back into White's cell. After a few seconds (18:57:03), he leaves the area and White pushes trash back out into the hallway. At 18:58:55, White can be observed pulling trash back into his cell. At 10:59:41, White throws a piece of trash into the hallway. Another inmate who cannot be seen from this camera angle throws what appears to be a towel to White at 19:00:40, and White throws it back at 19:01:01. The video runs until approximately 19:04:15 without further incident.

The other video of the incident is shot head-on at White and the prisoner in the cell next to him. White's cell is dark, while the other prisoner's cell is illuminated. The video begins at the same time stamp as the first video, 18:50:00. The events are the same in this video, and are merely shot from a different angle. At about 18:54:32, Phillips begins to sweep trash back into White' s cell. White reaches out and grabs the broom handle (18:54:42), releases it after a few seconds (18:54:44), and Phillips and White are clearly exchanging heated words and gesticulating. At 18:54:48, Phillips reaches through the bars and can be seen pulling White close to him. At 18:55:01, Phillips gets closer to the bars and the broom handle appears to rest against the bars. Phillips resumes sweeping (18:55:10), and White appears to swat at the broom handle (18:55:19). At 18:55:23, Phillips steps close to the bars and slowly places the broom handle inside the bars, as if to make White step back. He removes it after a few seconds (18:55:28) and resumes sweeping. Other than the two men exchanging words, there is no other contact between them and no one else enters the video.

- 7 -

Regarding the other incidents about which plaintiff complains, defendant also submitted numerous incident reports about a myriad of exchanges between plaintiff and officers, inmates and other correctional staff members. Ten days after the September 14, 2018 incident, on September 24, 2018, following a disturbance in which White was "yelling in an extremely loud tone" and "refuse[d to comply with] orders to cease," a chemical agent known as "Fox" was applied by Lieutenant Scotel Temple. Record Doc. No. 25-3 at p. 6 Fifteen minutes after this incident, Captain Wade Rigdon reported that White "had an ice pick weapon in his cell . . . fashioned from one of the metal rings from the Sleet 4 Posted Policy Book's 3 ring binder." Id. at p. 7. White stated that "he intended to use it on Offender Michael Young . . . if given the opportunity." Id. Notably, Kevin Wilson [who plaintiff says retaliated against him] was involved in "[shaking] down [the] cell." Id. Thereafter, he was placed on "standard suicide watch." Record Doc. No. 25-3 at p. 4. White was found guilty of disciplinary violations for contraband, defiance and property destruction. Id. at p. 8. The record contains a disciplinary report noting that on September 25, 2018, White was found guilty of self-mutilation and contraband. Id. at p. 14. A report by Kevin Wilson notes that White was placed on "Extreme Suicide Watch 2 point [with] soft restraints" on that day by Nurse Rebekah Jenkins because "he had self-inflicted superficial scratches on his left arm . . . with a piece of iron." Id. at pp. 15-21.

The record also reflects that on October 19, 2018, at about 8:20 p.m., White stated that he would like to declare a medical emergency. Id. at p. 43. Once the medical staff arrived, he was restrained and escorted to the lobby by Corin Weisbrodt [who plaintiff

- 8 -

testifies retaliated against him]. Id. As medical personnel were attending to him, "he became irate and began cursing at CSM Weisbrodt." Record Doc. No. 25-3 at p. 43. White refused to cooperate with medical personnel, who noted that he was "in no apparent distress and could be placed in his cell." Id.  When ordered to walk back to his cell, White "began cursing at CSM Weisbrodt once more by stating, 'Fuck all yall [sic], I am going to get your job, [j]ust like I did Phillips! Oh yeah I'm going to get it.'" Id. at pp. 43-44. The report then details how White attempted to spit on the officer escorting him, Brian Nichols, who attempted to stop White by "plac[ing his] hand on the left side of [plaintiff's] head to direct his face away from [Nichols] in an attempt to keep him from spitting on or towards [Nichols]. This caused White's head to make contact with the pin box. . . . Offender White was placed against the Sleet 3R pin box and was given another direct verbal order to stop his actions to which he complied by stating, 'See that was on camera bitch, I got ya! Yall [sic] are going down for this, yep I got all your jobs now.'" White was found guilty of disciplinary violations for defiance and aggravated disobedience for this incident. Id.

The rest of the myriad of disciplinary reports do not appear to involve the incidents White mentioned in his Spears hearing.

## **ANALYSIS**

I.    STANDARDS OF REVIEW

A.    SCREENING STANDARDS

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless of whether it has also been filed

in forma pauperis.  28 U.S.C. § 1915A(a); Thompson v. Hicks, 213 F. App'x 939, 942 (11th Cir. 2007); Lewis v. Estes, 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir. 2006); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998);  Lewis v. Sec'y, DOC, No. 2:10-CV-547-FTM-29, 2013 WL 5288989, at *2 (M.D. Fla. Sept. 19, 2013), aff'd, 589 F. App'x 950 (11th Cir. 2014).  After review in the screening process, the court must "identify cognizable claims or dismiss the complaint" if it or portions of it are frivolous or fail to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); Lewis, 589 F. App'x at 952; Thompson, 213 F. App'x at 942; Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis

of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25, 112 S. Ct. 1728 (1992)), and may consider and rely upon additional evidence, as long as it is properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents."  Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).

After a Spears hearing, the complaint may be dismissed, in whole or in part, as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."  Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269. A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

    B.    STANDARD FOR MOTION TO DISMISS

Fed. R. Civ. P. 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted. The Supreme Court recently clarified the standard for a motion to dismiss under Rule 12(b)(6):

> "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."

Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 796 (5th Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007))).

"The Supreme Court's decisions in Iqbal and Twombly . . . did not alter the long-standing requirement that when evaluating a motion to dismiss under Rule 12(b)(6), a court must 'accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." Id. at 803 n.44 (quoting True v. Robles, 571 F.3d 412, 417 (5th Cir. 2009)) (internal quotation omitted).

The Rule 12(b)(6) analysis is generally confined to a review of the complaint and its proper attachments. Walch v. Adjutant Gen.'s Dep't, 553 F.3d 289, 293 (5th Cir. 2008). Defendants' motions address only the sufficiency of the allegations of the complaint as a matter of law, not whether the allegations are true. Thus, for purposes of these motions, the court accepts "all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiffs.'" Jabary v. City of Allen, 2013 WL 6153241, at *3 (5th Cir. Nov. 25, 2013) (quoting Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008)). "With respect to any well-pleaded allegations 'a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 664).

＊　　＊　　＊

In this case, plaintiff's claims against defendants must be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims, and the motion to dismiss should be granted. Plaintiff's complaint, as

amended by his testimony at the <u>Spears</u> hearing, fails to state a claim under the broadest reading.[1]

## II.    EXCESSIVE FORCE

White alleges that Phillips used excessive force when he grabbed his upper arm, grabbed him around the throat and poked him with a broom.  Plaintiff was a convicted prisoner at the time of the incident about which he complains.  The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'" <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 34 (2010) (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 4 (1992)).  The Supreme Court in <u>Wilkins</u> confirmed that the standards it established in <u>Hudson</u> remain the law.

> The "core judicial inquiry," we held [in <u>Hudson</u>], was not whether a certain quantum of injury was sustained, but rather "whether force was applied **in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm**." 503 U.S. at 7, 112 S. Ct. 995; <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319-321 . . . (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. . . ." <u>Hudson</u>, 503 U.S. at 9 . . . .
>
>     . . . . As we stated in <u>Hudson</u>, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  503 U.S. at 9 . . . . "The Eight Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  <u>Ibid.</u> (some internal quotation marks omitted).  An inmate who

---

[1]The court must "liberally construe briefs of <u>pro se</u> litigants and apply less stringent standards to parties proceeding <u>pro se</u> than to parties represented by counsel," <u>Smith v. Lonestar Constr., Inc.</u>, 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); <u>Moore v. McDonald</u>, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Id. at 37-38 (emphasis added).

The Supreme Court in Wilkins "left open the possibility of dismissal where the injury conclusively shows that the force applied was not unconstitutional." Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing Wilkins, 130 S. Ct. at 1180) (emphasis added). Wilkins confirmed that Hudson remains the touchstone for evaluating claims under the Eighth Amendment. Thus, the Fifth Circuit's prior cases that relied on Hudson continue to provide binding legal standards for this court.

Under the Eight Amendment and Section 1983, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson, 503 U.S. at 6; accord Petta v. Rivera, 143 F.3d 895, 901 (5th Cir. 1998); Flowers v. Phelps, 956 F.2d 488, 491 (5th Cir. 1992). Plaintiff need not show a significant injury to establish a constitutional violation; however, the extent of injury may be considered in determining whether the force used was malicious, wanton or unnecessary. Hudson, 503 U.S. at 7; Flowers, 956 F.2d at 491. In addition, "[t]he Eight Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (quoting Hudson, 503 U.S. at 9-10).

The law thus

> require[s] a plaintiff asserting an excessive force claim to have suffered at least some form of injury . . . . [W]e do not permit a cause of action for every contact between a citizen and a police officer. In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation. When the force used is insufficient to satisfy the legal standard necessary for recovery, the amount of force is de minimis for constitutional purposes.

Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) (quotation omitted). To determine whether injury caused by excessive force is more than de minimis for constitutional purposes, the context in which the force was used and all the surrounding circumstances must be examined. Id.

At this early screening stage of the case, plaintiff's assertions must be construed in his favor, without credibility determinations. Applying this standard, and after reviewing the evidence in the record including the video footage of the incident, I find that White's complaint, broadly construed and expanded upon by his Spears testimony, does not state a viable excessive force claim under Section 1983.

White alleges, and the record confirms, that he was taken to see Nurse Angela Myres after the incident and she noted a small cut on his right upper arm. Record Doc. No. 25-2 at p. 2. Significantly, though White alleges that his neck was "hurting" and there was a "red mark" on his neck from Phillips's alleged grabbing him around the neck, nothing in the record indicates that he complained of this injury and Nurse Myres did not mention it. Though White testified that he suffered a scratch on his stomach and "a little blood" after Philips allegedly poked him with the broom, there was no mention of any such injury in the report after the incident. Record Doc. No. 25-2 at p. 2.

Interestingly, the record reflects that ten days after this incident with Philips, White was placed on "standard suicide watch." Record Doc. No. 25-3 at p. 4. The record contains a disciplinary report noting that on September 25, 2018, White was found guilty of self-mutilation and contraband. Id. at p. 14 (emphasis added). A report by Kevin Wilson notes that White was placed on "Extreme Suicide Watch 2 point [with] soft restraints" on that day by Nurse Rebekah Jenkins because "he had self-inflicted superficial scratches on his left arm . . . [caused by] a piece of iron." Id. at pp. 15-21 (emphasis added). Thus, it is unclear, given White's mental state shortly after this incident, whether the scratch on his upper right arm was caused by Phillips or whether it was self-inflicted. For the purposes of this report, however, I will assume it was caused by Phillips.

In my review of the video, the footage begins with White throwing a bed sheet or towel out of his cell. Other trash seen in the hallway appears to be trash that White threw out of his cell before the video began. The confrontation between the two appears to begin when Phillips begins sweeping the trash back into White's cell. The two engage in pushing, sweeping or throwing the trash back and forth through the cell bars until White escalates the incident when he reaches out and grabs the broom handle while Phillips is sweeping trash back into his cell. Phillips and White appear to exchange words, and then Phillips can be seen reaching through the bars and pulling White close to him. It is unclear whether Phillips grabs White's clothing or his body. White grabs the broom handle when he does so. Phillips then releases White and resumes sweeping, and shortly afterwards White tries to grab the broom handle again. Philips reaches through the bars and seems to grab White.

Again, it is unclear from the video whether Philips is grabbing White's clothing or his body. Phillips then appears to <u>place</u> the broom handle through the bars very slowly and deliberately, as if to cause White to step back. The video clearly does <u>not</u> show Phillips aggressively poking White with the broom or using it as any sort of weapon in such a way that would harm him.

It is clear from the video that only minimal "force was applied in a good faith effort to maintain or restore discipline . . . [and not] maliciously and sadistically for the very purpose of causing harm." <u>Hudson</u>, 503 U.S. at 6; <u>accord</u> <u>Petta</u>, 143 F.3d at 901; <u>Flowers</u>, 956 F.2d at 491. White was clearly causing a disturbance by throwing bed sheets or towels and trash out of his cell and grabbing Phillips's broom. The force applied by Phillips was neither a malicious nor sadistic spearing of White with a broom. Instead, the broom was pushed toward him slowly, to cause White to move away in response to the clear threat to prison discipline and security that White's actions were causing. Phillips does not appear to hold White by the arm or neck for any extended length of time, and White did not complained of injuries from those alleged uses of force at the time. The minor injuries about which he complains were de minimis. Accordingly, plaintiff does not state a cognizable claim of violations of his constitutional rights for excessive force under these circumstances.

## III.    <u>RETALIATION</u>

White alleges that Corin Weisbrodt and Kevin Wilson retaliated against him because he "got [Phillips] fired." Specifically, he alleges that Weisbrodt, who is allegedly Phillips'

cousin, said that he was responding to White's self-declared emergency and ordered plaintiff out of his cell, put him in handcuffs, slammed his head "into the key box" and jumped on him. Weisbrodt allegedly said that he did this because "[plaintiff] got his cousin fired." Plaintiff stated that he was found not guilty for these charges. Plaintiff also testified that Wilson, allegedly Phillips's uncle, retaliated against him by "writing [him] up for no reason . . . for aggravated disobedience and defiance." Plaintiff stated that he was found guilty for defiance.

As to retaliation, it is correct that prison officials may not retaliate against a prisoner for exercising his First Amendment right of access to the courts or to complain through proper channels about alleged misconduct by prison officials. Walker v. Savers, No. 15-10364, 2016 WL 4151212, at *5 (5th Cir. Aug. 4, 2016) (citing Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006)); Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995). However, the law in the Fifth Circuit concerning prisoner retaliation claims has undergone substantial evolution in recent years. It is based on the following general principles:

> The elements of a retaliation claim are the invocation of a specific constitutional right, the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, i.e., but for the retaliatory motive the complained of incident . . . would not have occurred. With respect to the last element, we [have] emphasized that an action motivated by retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, may have been legitimate.

Clarke v. Stalder, 121 F.3d 222, 231 (5th Cir. 1997), vacated in part & reinstated in relevant part, 154 F.3d 186 (5th Cir. 1998) (citing Bounds v. Smith, 430 U.S. 817 (1977); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Woods, 60 F.3d at 1164-66) (quotations and additional citations omitted); accord Walker, 2016 WL 4151212, at *5; Hanna v. Maxwell, 415 F. App'x 533, 535 (5th Cir. 2011).

In Woods, the Fifth Circuit, applying the general First Amendment principles addressed above, affirmed the district court's denial of defendants' motion for summary judgment. Defendants had sought dismissal of a prisoner's claim based on allegedly false disciplinary charges by defendants in alleged retaliation for plaintiff's letters of complaint to a federal judge and the prison warden. The Fifth Circuit agreed with the district court that the inmate's retaliation claim should be permitted to proceed, but in doing so it expressed the following caution: "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." Woods, 60 F.3d at 1166 (citation and quotation omitted). The Fifth Circuit warned that "trial courts must carefully scrutinize these claims." Id.

> To state a claim of retaliation an inmate must allege the violation of a specific constitutional right and be prepared to establish that but for the retaliatory motive the complained of incident . . . would not have occurred. This places a significant burden on the inmate . . . . The inmate must produce direct evidence of motivation or, the more probable scenario,

"allege a chronology of events from which retaliation may plausibly be inferred."

Id. (citations omitted) (emphasis added); accord Walker, 2016 WL 4151212, at *5.

A year after Woods was decided, the Supreme Court reexamined the scope of prisoners' First Amendment right of access to the courts in Lewis v. Casey, 518 U.S. 343 (1996). Significantly, to state a claim that his constitutional right of access to the courts was violated, a prisoner must demonstrate that his position as a litigant was actually prejudiced. Id. at 356; Every v. Jindal, 413 F. App'x 725, 727 (5th Cir. 2011) (citing Lewis, 518 U.S. at 349-50; Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999)); Cochran v. Baldwin, 196 F. App'x 256, 257-58 (5th Cir. 2006) (citing Lewis, 518 U.S. at 350-51); Eason v. Thaler, 73 F.3d 1322, 1328 (5th Cir. 1996). In Lewis, the Supreme Court made clear that an inmate must establish actual injury to state a claim for denial of his right of access to the courts. Id. at 349-50.

A few years ago in Morris, a case of first impression in the Fifth Circuit, the court addressed "[w]hether an allegation of de minimis retaliatory acts can support a retaliation claim" under the First Amendment. Morris, 449 F.3d at 684. The court stated that

> [t]he question, however, is not whether the violation of [plaintiff's] constitutional rights was de minimis, but whether any violation occurred at all. To establish a constitutional violation, an inmate must show that he suffered a qualifying adverse retaliatory act. If the retaliation alleged by [plaintiff] does not pass this bar, he has suffered no constitutional injury.

Id. The Fifth Circuit held that

- 21 -

> [t]he purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights. Some acts, though maybe motivated by retaliatory intent, are so <u>de minimis</u> that they would not deter the ordinary person from further exercise of his rights. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.
>
> . . . . Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights. . . .
>
> With this standard in mind, we turn to the specific retaliation alleged by [plaintiff] to determine whether the actions of the [prison] officials would have deterred a person of ordinary firmness from exercising his First Amendment right to file grievances against prison officials.

<u>Id.</u> at 686 (citing <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 n.10 (1998)).

The Fifth Circuit's reasoning and rulings in <u>Morris</u> accord with the Supreme Court's holding in <u>Lewis</u> that a prisoner who brings a retaliation claim under the First Amendment must allege actual injury in order to assert a claim. Furthermore, the alleged retaliatory acts must be more than de minimis, which means they must be capable of deterring a person of ordinary firmness from further exercising his constitutional rights. A "loss of 180 days of 'good time' credit [is] more than mere <u>de minimis</u> adverse actions under this Circuit's case law." <u>Hanna</u>, 415 F. App'x at 536 (citations omitted).

Thus, the law in the Fifth Circuit

> is well established that prison officials may not retaliate against an inmate who exercises his right of access to court. Officials likewise may not retaliate against an inmate for using the grievance system. A plaintiff must allege facts showing that the defendant possessed a retaliatory motive. The inmate must show <u>more than his personal belief that he was the victim of retaliation. Mere conclusory allegations of retaliation are not enough.</u>

Decker v. McDonald, No. 5:09cv27, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010), report & recommendation adopted, 2010 WL 1424292 (E.D. Tex. Apr. 7, 2010) (citing Morris, 449 F.3d at 687; Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988); Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988)) (additional citations omitted) (emphasis added); accord Walker, 2016 WL 4151212, at *5.

Accepting as true plaintiff's testimony and written allegations, he has not established that a violation of his federal constitutional rights concerning retaliation has occurred under the circumstances he described.  The Fifth Circuit has stated that the existence of a "[legitimate] prison disciplinary report is highly probative, if not dispositive, of whether a defendant acts with a retaliatory animus."  Rankin v. Pearson, No. 5:11CV138-DCB-RHW, 2013 WL 1305517, at *6 (S.D. Miss. Mar. 26, 2013), aff'd, 612 F. App'x 204 (5th Cir. 2015) (citing Woods, 60 F.3d at 1166); accord Reese v. Skinner, 322 F. App'x 381, 383-84 (5th Cir. 2009).  The record of White's disciplinary violations at Rayburn does not demonstrate "but for" causation; instead, it demonstrates that [defendants] had a reasonable, non-retaliatory motivation for charging White with the violations.  Walker, 2016 WL 4151212, at *6 (quotation omitted) (citing McDonald, 132 F.3d at 231).

- 23 -

As to the incidents themselves, there are two discussed above that most closely match the incidents plaintiff complained of during his <u>Spears</u> hearing. First, the record reflects that on September 24, 2018, Kevin Wilson was involved in "[shaking] down [White's] cell" Record Doc. No. 25-3 at p. 7,  following a disturbance where White was "yelling in an extremely loud tone," and "refuse[d to comply with] orders to cease." <u>Id.</u> at p. 6. At that time, a chemical agent known as "Fox" was applied by Lieutenant Scotel Temple. <u>Id.</u> Fifteen minutes after this incident, Captain Wade Rigdon reported that White "had an ice pick weapon in his cell . . . fashioned from one of the metal rings from the Sleet 4 Posted Policy Book's 3 ring binder." <u>Id.</u> at p. 7. White stated that "he intended to use it on Offender Michael Young . . . if given the opportunity."  <u>Id.</u> Thereafter, plaintiff was placed on "standard suicide watch." Record Doc. No. 25-3 at p. 4. White was found guilty of disciplinary violations for contraband, defiance, and property destruction. <u>Id.</u> at p. 8.

The record also reflects that on October 19, 2018, White stated that he would like to declare a medical emergency. <u>Id.</u> at p. 43. Once the medical staff arrived, he was restrained and escorted to the lobby by Weisbrodt. <u>Id.</u> As the medical personnel were attending to him, "he became irate and began cursing at . . . Weisbrodt." Record Doc. No. 25-3 at p. 43. White refused to cooperate with the medical personnel, which led to the personnel advising that he was "in no apparent distress and could be placed in his cell." <u>Id.</u> When ordered to walk back to his cell, White "began cursing at CSM Weisbrodt once more by stating, 'Fuck all yall [sic], I am going to get your job, [j]ust like I did Phillips! Oh yeah

I'm going to get it.'" Id. at pp. 43-44. The report then details how White attempted to spit on the officer escorting him, Brian Nichols, who attempted to stop White by "plac[ing his] hand on the left side of [plaintiff's] head to direct his face away from [Nichols] in an attempt to keep him from spitting on or towards [Nichols]. This caused White's head to make contact with the pin box. . . . Offender White was placed against the Sleet 3R pin box and was given another direct verbal order to stop his actions to which he complied by stating, 'See that was on camera bitch, I got ya! Yall [sic] are going down for this, yep I got all your jobs now.'" White was found guilty of disciplinary violations for defiance and aggravated disobedience for this incident. Id.

These reports in the record clearly demonstrate that Weisbrodt and Wilson had a reasonable, non-retaliatory motivation for charging White with the violations. It is clear that White was guilty of the disciplinary violations he was charged with in each instance. The circumstances surrounding each of the incidents described above clearly warrant disciplinary action and do not in any way demonstrate any retaliatory motive. At no point in either of the reports, or elsewhere in the record, is there any mention of Weisbrodt and Wilson saying anything about Phillips. On the contrary, plaintiff's statements during the second incident about "getting" Phillips and their jobs indicate a motive on his part to get Weisbrodt and Wilson fired. Under these circumstances, I cannot conclude that White states a cognizable Section 1983 claim that Weisbrodt or Wilson retaliated against him.

IV.    DENIAL OF ARP GRIEVANCE

- 25 -

White alleges that defendant Robert Tanner improperly denied his ARP grievance after the incident with Phillips. Specifically, he claims that Tanner "granted it on the first step but denied it on the second step." This complaint fails entirely to state a claim for relief under Section 1983.

The Fifth Circuit has held that an inmate "does not have a federally protected liberty interest in having . . . grievances resolved to his satisfaction.  As he relies on a legally nonexistent interest, any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless."  Geiger v. Jowers, 404 F.3d 371, 374-75 (5th Cir. 2005) (citing Sandin v. Conner, 515 U.S. 472, 484 (1995); Orellana v. Kyle, 65 F.3d 29, 31-32 (5th Cir. 1995)); accord Bell v. Woods, 382 F. App'x 391, 392 (5th Cir. 2010); Johnson, 360 F. App'x at 532.  "Additionally, [as discussed above, plaintiff] could not show any injury from the failure [adequately] to consider his grievances because the alleged [actions of jail officials of which] he complained . . . in the grievances did not implicate his constitutional rights."  Bell, 382 F. App'x at 392.

In this case, White commenced the prison's ARP by filing grievances concerning his claims arising from the incident with Phillips.  In the constitutional sense, an ARP, at most, may be viewed as a means of effectuating plaintiff's First Amendment right to petition the government for redress of grievances.  In this instance, plaintiff's grievances were received and processed through the ARP, although the ARP did not end with the results that he wanted.  The Fifth Circuit has held that allegations that a prison official

has failed adequately to follow particular prison rules, regulations or procedures, such as an ARP, cannot support a Section 1983 claim, without an independent constitutional violation. McFaul v. Valenzuela, 684 F.3d 564, 579 (5th Cir. 2012) (citing Dist. Attorney's Ofc. v. Osborne, 557 U.S. 52, 67 (2009); Jackson, 864 F.2d at 1251-52; Neuwirth v. La. State Bd. of Dentistry, 845 F.2d 553, 557 (5th Cir. 1988)); Patel v. Haro, 470 F. App'x 240, 244 (5th Cir. 2012); Stanley v. Foster, 464 F.3d 565 (5th Cir. 2006). The  record clearly shows that White's ARP grievance was denied at both steps. Record Doc. No. 25-2 at pp. 4-5. The record also reflects that White filed a second ARP grievance in connection with this incident, alleging that Phillips struck him in the face. Record Doc. No. 25-2 at p. 15. However, this ARP was denied because, when plaintiff first complained of the incident, he "made no claim of [Phillips] striking [him] in the face." Id.

For these reasons, White's dissatisfaction with defendant Tanner's response to his ARP grievances fails to state a cognizable Section 1983 claim.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that defendant's motion to dismiss for failure to state a claim, Record Doc. No 24, be **GRANTED**, and that plaintiff's complaint be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14)

- 27 -

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[2]

New Orleans, Louisiana, this _____25th_____ day of June, 2019.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.